CHAMBERS OF
STEPHANIE A. GALLAGHER
UNITED STATES MAGISTRATE JUDGE

101 WEST LOMBARD STREET
BALTIMORE, MARYLAND 21201
(410) 962-7780
Fax (410) 962-1812

April 5, 2019

LETTER TO COUNSEL

RE:    *Jowite Ltd. Partnership v. Federal Insurance Co.*
          Civil Case No.: SAG-18-2413

Dear Counsel:

This matter has been referred to me for all proceedings, by consent of the parties. ECF 13-15, 17. Plaintiff Jowite Limited Partnership ("Jowite") filed this lawsuit against Defendant Federal Insurance Company, alleging breach of contract relating to the insurance policy covering Jowite's building. ECF 1. Presently pending are two discovery disputes.[1] On February 27, 2019, Jowite filed a Motion to Modify Subpoenas and for Protective Order. ECF 32. Defendant has filed a Response, ECF 34, and Jowite has filed a Reply, ECF 39. On March 12, 2019, Jowite submitted a letter outlining separate discovery disputes relating to several pieces of evidence it requested from Defendant. ECF 36. Defendant submitted a response letter, ECF 38, and Jowite submitted a reply, ECF 41. I find that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2018). For the following reasons, Jowite's motion, ECF 32, is GRANTED in part and DENIED in part. Jowite's requests in its letter of March 12, 2019, ECF 36, are also GRANTED in part and DENIED in part.

## I.    BACKGROUND

Jowite owns rental housing consisting of three apartment building located at 406 Moton Street in Easton, Maryland ("Jowite property"), for low- and moderate-income residents. ECF 24 ¶¶ 6–7. Jowite maintained an insurance policy with Defendant, covering building and personal property coverage, as well as coverage for loss of business income and debris removal in case of demolition. *Id.* ¶ 8. T.M. Associates, which managed the Jowite property, arranged for an inspection of the one of the Jowite buildings by Done Right, LLC, whose written report of March 2, 2017, found significant damage to the foundation and recommended demolition of the building. *Id.* ¶ 13. On or about July 18, 2017, an insurance claim was filed with Defendant relating to the damage to the foundation. ECF 36-4 at 1. The adjuster for Jowite's claim was John Little, an employee of Chubb.[2] On July 26, 2017, Little sent a "reservation of rights" letter to T.M. Associates, which noted that the "initial file review and policy analysis revealed some potential

---

[1] A third discovery dispute between the parties is not yet ripe, *see* ECF 43, 44, and is therefore not addressed in this letter opinion. The parties should advise chambers if they are able to resolve that third dispute based on the issues decided in this opinion.

[2] Defendant is a member of the Chubb Insurance Group. ECF 24 ¶ 2.

coverage reservations with regards to the long-term and reoccurring ground and structural settling." ECF 38-9 at 3. Defendant then arranged for an inspection by Nicholas Palumbo, an engineer employed by Building Envelope Consultants and Scientists. *Id.*; ECF 24 ¶ 14. Palumbo issued an initial report on August 8, 2017, confirming the significant damage to the foundation, and conducted a second inspection on August 27, 2017. ECF 36-4 at 2.

At some point in the claim process, Jowite contacted Harvey Goodman of the public adjusting firm Goodman-Gable-Gould for assistance in adjusting the claim. ECF 38 at 2. Goodman notified Defendant of his representation of Jowite on August 8, 2017. ECF 38-10. Two days later, in an email correspondence, Goodman forwarded Defendant some Maryland caselaw to support Jowite's claim for coverage, saying the cases "were previously provided to [Goodman] by counsel." ECF 38-11 at 4.

After its investigation, Defendant denied coverage by letter dated December 28, 2017, claiming that the losses suffered by Jowite were excluded from coverage under the policy. ECF 36-4. Defendant has identified at least five exclusions in the policy that it claims bar coverage: settling, wear and tear, planning design, materials or maintenance, acts or decisions, and inherent vice/latent defect. *Id.* at 4-6, ECF 36-5 at 2. Each of those five exclusions contain an exception clause, and the parties' disagreement is essentially whether the damage to the Jowite property falls into an exception to those exclusion clauses.

## II.    JOWITE'S MOTION TO MODIFY SUBPOENAS AND FOR PROTECTIVE ORDER

Jowite has filed a motion to modify two subpoenas Defendant issued to third-parties, and to request a protective order. ECF 32.[3]  Generally, a party to a suit may challenge a subpoena issued to a nonparty only if "the party claims some personal right or privilege in the information sought by the subpoena." *Fangman v. Genuine Title, LLC*, Civil Action No. RDB-14-0081, 2016 WL 560483, at *3 (D. Md. Feb. 12, 2016) (quoting *United States v. Idema*, 118 F. App'x, 740, 744 (4th Cir. 2005) (unpublished per curiam opinion)); *CineTel Films, Inc. v. Does 1-1,052*, 853 F. Supp. 2d 545, 554 (D. Md. 2012). Here, Jowite's claims of work product protection and privacy interest in its tax returns are enough to satisfy its standing requirement to challenge the subpoenas.

Federal Rule of Civil Procedure 45(d)(3)(A) directs courts to quash or modify a subpoena that, inter alia, "requires disclosure of privileged or other protected matter, if no exception or waiver applies" or "subjects a person to undue burden." Fed. R. Civ. P. 45(d)(3)(A)(iii)-(iv). Rule 26(c)(1) permits "[a] party or any person from whom discovery is sought" to seek a protective order, and courts may, "for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c)(1). "This undue

---

[3] Defendant opposes Jowite's motion on the grounds that it failed to comply with Judge Russell's Standing Order on Discovery Procedures, ECF 12-2, and failed to include the required certification under Federal Rule of Civil Procedure 26(c)(1) that Jowite in good faith conferred or attempted to confer with Defendant to resolve the dispute. Jowite included the certification in its Reply to Defendant's Response. In the interest of efficiency, I am deciding the merits of the dispute in this letter. However, in the future, the parties are advised to follow Judge Russell's standing order, even though he is no longer the presiding judge in this case.

burden category encompasses situations where the subpoena seeks information irrelevant to the case." *U.S. Home Corp. v. Settlers Crossing, LLC*, No. DKC-08-1863, 2013 WL 5530282, at *7 (D. Md. Oct. 3, 2013) (quotations and citations omitted). "Thus, if the discovery sought has no bearing on an issue of material fact—*i.e.*, if it is not relevant—a protective order is proper." *Id.* (quotations and citations omitted). Where a protective order is sought, the moving party bears the burden of establishing good cause. *Webb v. Green Tree Servicing LLC*, 283 F.R.D. 276, 278 (D. Md. 2012). "Normally, in determining good cause, a court will balance the interest of a party in obtaining the information versus the interest of his opponent in keeping the information confidential or in not requiring its production." *UAI Tech., Inc. v. Valutech, Inc.*, 122 F.R.D. 188, 191 (M.D.N.C. 1988) (citing *Farnworth v. Procter & Gamble Co.*, 758 F.2d 1545 (11th Cir. 1985)). In other words, "the Court must weigh the need for the information versus the harm in producing it." *A Helping Hand, LLC v. Balt. Cnty., Md.*, 295 F. Supp. 2d 585, 592 (D. Md. 2003) (quoting *UAI Tech.*, 122 F.R.D. at 191). The standard for issuance of a protective order is high. *Minter v. Wells Fargo Bank, N.A.*, 258 F.R.D. 118, 125 (D. Md. 2009). However, trial courts have broad discretion to decide "when a protective order is appropriate and what degree of protection is required." *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 36 (1984).

### a.  Rauch Subpoena

On February 1, 2019, Defendant issued a subpoena and notice of deposition duces tecum to Rauch, Inc. ("Rauch"), an engineering and architecture firm that provided services to Jowite. ECF 32-1 at 2; ECF 32-2. Jowite objects to the subpoena on the grounds that it seeks irrelevant information and information that is protected work product.

### i.  Irrelevant Information Regarding Other Properties

Jowite objects to the second request in the subpoena to produce "[a]ny and all communication [sic] between Rauch, Inc. and Jowite Limited Partnership, the Parkway Apartments, Alvin Lapidus, their attorneys or insurance carriers." ECF 32-2 at 6. The Jowite property is owned by Jowite Limited Partnership. ECF 32-1 at 5. The Parkway Apartments are next to the Jowite property, and are owned by Easton Parkway Limited Partnership. *Id.* Alvin Lapidus is the managing member of both the Jowite and Easton Parkway Limited Partnerships. *Id.* Defendant argues "any geological, structural, or other settlement issues pertaining to the Parkway Apartments, and Alvin Lapidus's knowledge of the same, would be directly relevant to litigation involving the same issues literally next door." ECF 34 at 7. Because Jowite and Easton Parkway are distinct properties, owned by distinct partnerships, evidence related to the Easton Parkway properties would not help decide the issues in this case, particularly when the settling issues at the Jowite property became known and what efforts were taken to address those issues. To the extent that Rauch has "commingled," by writing reports or other communications covering both the Jowite and Easton Parkway properties, ECF 34 at 7, it should be able to produce all records relevant to Jowite, regardless of whether they also include information about Easton Parkway. Therefore, Defendant should modify the scope of the Rauch request to read, "Any and all communications between Rauch, Inc. and Jowite Limited Partnership, the Parkway Apartments, Alvin Lapidus, their attorneys or insurance carriers pertaining to the Jowite Apartment buildings."

## ii. Work Product and Expert Witness Discovery

Jowite also objects to the Rauch subpoena in its entirety, on the ground that it seeks protected work product and impermissible discovery from a potential expert witness. Under the work product doctrine, a party may not ordinarily "discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative." Fed. R. Civ. P. 26(b)(3)(A). An exception exists if the party seeking discovery can show it has a "substantial need" for the materials and that it cannot, "without undue hardship, obtain their substantial equivalent by other means." *Id.* The work product protection "arises from different circumstances" and protects different interests than the attorney-client privilege. *Nat'l Union Fire Ins. Co. v. Murray Sheet Metal Co., Inc.*, 967 F.2d 980, 984 n.4 (4th Cir. 1992); *Nutramax Labs., Inc. v. Twin Labs., Inc.*, 183 F.R.D. 458, 463 n.10 (D. Md. 1998). Federal law is applicable to determinations of work product protection, "[b]ecause the work product doctrine is not a privilege, but rather a qualified immunity from discovery." *Cont'l Cas. Co. v. Under Armour, Inc.*, 537 F. Supp. 2d 761, 769–70 (D. Md. 2008) (collecting cases). The proponent of the work product doctrine bears the burden of proving that the documents or communications at issue were created "in anticipation of litigation," and that they were prepared "by or for another party or its representative." *See* Fed. R. Civ. P. 26(a)(3)(A); *Solis v. Food Emp'rs Labor Relations Ass'n*, 644 F.3d 221, 232 (4th Cir. 2011).

As part of the discovery process, parties are required to disclose the identity of expert witnesses they may use at trial. Fed. R. Civ. P. 26(a)(2)(A). The Rules impose certain discovery requirements when the expert is "retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony." Fed. R. Civ. P. 26(a)(2)(B). The disclosure of such an expert witness must be accompanied by a written report, *id.*, drafts of which are protected work product, Fed. R. Civ. P. 26(b)(4)(B), as are communications between the expert witness and the party's attorney, with exceptions for communications relating to the expert's compensation, as well as facts, data, or assumptions from the attorney that the expert considered or relied on in forming the expert's opinion, *see* Fed. R. Civ. P. 26(b)(4)(C). Such an expert may only be deposed after the report required by Rule 26(a)(2)(B) is produced. Fed. R. Civ. P. 26(b)(4)(A).

Of course, not *every* expert witness who must be disclosed under Rule 26(a)(2)(A) need produce a written report. *Sullivan v. Glock, Inc.*, 175 F.R.D. 497 (D. Md. 1997) (terming such an expert a "hybrid witness," and an expert who must provide a report a "retained expert"). "A witness can be a hybrid witness as to certain opinions, but a retained expert as to others." *Id.* at 500. The question, here, becomes how to sequence discovery with a potential hybrid and retained expert witness.

Defendant issued the Rauch subpoena seeking, at least in part, Rauch's factual observations from an inspection it conducted of the Jowite property in 2017.[4] Jowite has indicated it intends to

---

[4] The dispute between the parties seems to have developed partly because Jowite initially failed to disclose a report that Rauch prepared in June of 2017, even though Defendant submitted to Jowite a written discovery request for "[a]ny and all report(s) related to the Occurrence and/or Claim and/or Insured Property, whether prepared by you or on your behalf." ECF 34 at 3, ECF 34-9. Jowite's counsel have explained they were not aware of the Rauch report, although the report was sent directly to Mr. Lapidus,

use Rauch as a retained expert witness.  In the interest of saving the parties the needless expense of having two separate depositions, Defendant shall delay deposing Rauch until after Jowite has made its Rule 26(a)(2) disclosures and, if applicable, has accompanied its disclosures with a Rule 26(a)(2)(B) report from Rauch.  With regard to Rauch's production of documents, Jowite lists in its privilege log its email communications with Rauch dating from October 10, 2018, to February 27, 2019.  ECF 39-8.  The Court is convinced that those communications were made in anticipation of litigation, since the insurance claim was denied on December 28, 2017, and the instant action was filed on August 8, 2018, ECF 1.  Jowite's inclusion of a privilege log in its reply, and its representation that it "has not objected to the production, on the basis of work product, of any documents created by Rauch before December 28, 2017, when the claim was denied," ECF 39 at 7, should be enough to settle, for the time being, the parties' dispute over the communications with Rauch withheld subject to work product protection.  The communications with Rauch in its role as fact witness are not included in the work product claim.

### b.  Clark Schaefer Hackett Subpoena

Jowite also objects to the scope of the subpoena served on its accounting firm, Clark Schaefer Hackett ("CSH"), seeking in part, "[a]ny and all documents relating to Jowite Limited Partnership," and "[a]ny and all communication [sic] Jowite Limited Partnership, its attorneys or insurance carriers," ECF 32-5 at 5.  Jowite argues the subpoena is overbroad and not proportional to the needs of the case.  Jowite also specifically argues that the subpoena would require the disclosure of tax returns, as well as communications made after litigation commenced that would be protected work product.

Although the Fourth Circuit has not developed a clear rule as to the discoverability of tax returns, in general, disclosure of tax returns is disfavored.  *Susko v. City of Weirton*, Civ. Action No. 5:09-CV-1, 2010 WL 3584425, at *3 (N.D. W.Va., Sept. 10, 2010) ("[J]udicial consensus exists that, as a matter of policy, great caution should be exercised in ordering the disclosure of tax returns"); *E. Auto Distribs., Inc. v. Peugeot Motors of Am., Inc.*, 96 F.R.D. 147, 148-49 (E.D. Va. 1982) ("[A] 'qualified' privilege emerges from the case law that disfavors the disclosure of income tax returns as a matter of general federal policy").  "The majority rule that has emerged from federal case law is that a two-prong test should be applied to determine if the qualified privilege protecting tax returns is overcome."  *Hastings v. OneWest Bank, FSB*, Civil Case No. GLR-10-3375, 2013 WL 1502008, at *2 (D. Md. Apr. 11, 2013) (quoting *Interstate Narrow Fabrics, Inc. v. Century USA, Inc.*, No. 1:02CV00146, 2004 WL 444570, at *2 (M.D.N.C., Feb.24, 2004)).  "Under this test, tax returns are discoverable if (1) they are relevant to a matter in dispute; and (2) they are needed, because the information is not available from other sources."  *Id.*  "The party seeking disclosure carries the burden to show that the tax returns are relevant, and the resisting party carries the burden to identify an alternate source of the information."  *Id.*

---

*see* ECF 34-9 at 3, and argue that the report would not have been responsive to Defendant's discovery request because "it was not a 'report' related to the 'Occurrence' or the 'Claim', but a 'cursory overview of the current condition of the apartment building units in the Parkway Apartments complex.'"  ECF 39 at 3.  The document prepared by Rauch for Jowite was clearly labeled a report, and it specifically noted visible "foundation cracks" on the exterior of the Jowite Property.  ECF 34-9 at 5-11.  Therefore, it should have been disclosed in response to Defendant's discovery request.

Defendant has argued the CSH subpoena is necessary to discern: (1) what work Jowite performed on the building's foundation before the 2017 inspections; and (2) Jowite's "motive for failing to mitigate the long-term damages associated" with the settlement of the foundation. ECF 34 at 11. Accordingly, Defendant should modify the scope of the Rauch subpoena to the timeframe prior to Defendant's denial of Jowite's claim, December 28, 2017. Furthermore, while Defendant argues that Jowite's financial data are relevant, it does not claim that Jowite's tax returns are relevant to the matter in dispute, *see Hastings*, 2013 WL 1502008, at *2. Therefore, the CSH subpoena should be modified to specify that CSH need not produce any of Jowite's tax returns.

## III. JOWITE'S LETTER SEEKING DISCOVERY MATERIALS FROM DEFENDANT

In a March 12, 2019, letter to the Court, ECF 36, Jowite seeks certain records from the Defendant: (1) documents relating to the drafting of particular portions of the insurance policy; and (2) reports prepared by Defendant's engineer after Jowite submitted its claim for coverage.[5] Defendant asserts it should not have to turn over the drafting documents because the language of the policy is not ambiguous and because some of the documents Jowite seeks are irrelevant to the suit. ECF 38 at 5-7. Defendant also argues that the engineer reports are protected from discovery under the work product doctrine. ECF 38 at 7-10.

### a. Drafting of Insurance Policy

Jowite requested Defendant produce all documents relating to the drafting of two types of provisions appearing in various exclusions in the policy. ECF 36 at 2. The first type of provision is an exception clause appearing in some of the policy's exclusions, which states that the "exclusion does not apply to ensuing loss or damage caused by or resulting from a peril not otherwise excluded." *Id.* The second provision appears in different exclusions and states that the exclusion applies "regardless of any other cause or event that directly or indirectly: contributes concurrently to; or contributes in sequence to, the loss or damage, even if such other cause or event would otherwise be covered." *Id.* at 2-3. This second type of clause is sometimes called an "anti-concurrent cause" provision. *Id.* at 3. Defendant refused Jowite's production requests on the grounds that it requested information that was not relevant to the case or proportional to the needs of the case, and that "[t]he drafting of the policy in question is not arguably relevant until the policy has been adjudicated as ambiguous. As the Court will interpret the terms of the policy that the parties agreed to, the circumstances of its drafting are immaterial." ECF 36 at 2, 3.

Federal Rule of Civil Procedure 26(b)(1) permits discovery of "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." In determining proportionality, the Court must consider "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1).

---

[5] The parties have resolved other disputes raised in their letters regarding records Defendant was withholding on the basis of proprietary information, and records that Jowite was withholding on the basis of attorney-client privilege and work product protection. *See* ECF 38 at 9; ECF 41 at 8, 9 n.4.

As a preliminary matter, the Court must decide what law to apply. The Court has diversity jurisdiction over this case pursuant to 28 U.S.C. § 1332(a)(1). *See* ECF 1, 24. Thus, the Court must apply the substantive law of the state in which the action arose, *see Nationwide Mut. Ins. Co. v. Welker*, 792 F. Supp. 433, 437 (D. Md. 1992) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)), and the choice of law rules of the forum. *See Harvard v. Perdue Farms, Inc.*, 403 F. Supp. 2d 462, 466 (D. Md. 2005) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941)). Unless the contract contains a choice-of-law provision, Maryland courts generally apply the rule of *lex loci contractus* to breach of contract cases, applying the law of the jurisdiction where the contract was made. *Allstate Ins. Co. v. Hart*, 327 Md. 526, 529 (1992); *American Motorists Ins. Co. v. ARTRA Group Inc.*, 338 Md. 560, 573 (1995). The act which makes an insurance contract binding, and thus the location where the contract is made, is "typically . . . where the policy is delivered and the premiums are paid." *E. Stainless Corp. v. Am. Prot. Ins. Co.*, 829 F.Supp. 797, 799 (D. Md. 1993) (quoting *Sting Sec., Inc. v. First Mercury Syndicate, Inc.*, 791 F. Supp. 555, 558 (D. Md. 1992)). However, if the insurance contract states that it is not valid until countersigned by the insurer, the place of countersigning is considered the location where the contract was made. *Id.* (citing *Ohio Cas. Ins. Co. v. Ross*, 222 F.Supp. 292, 295 (D. Md. 1963)).

In this case, it is not abundantly clear where the insurance policy was made. The insurance policy was issued to an entity named T.M. Associates, Inc., which managed the Jowite property and had a mailing address in Rockville, Maryland. ECF 24 ¶ 8; ECF 1-1 at 17. The policy listed the Jowite property as an insured, amongst over 200 properties apparently managed by T.M. Associates. *See* ECF 1-1 at 25-106. The signature page of the "Insuring Agreement" section of the policy states the "policy shall not be valid unless also signed by a duly authorized representative of the [insurance] company." ECF 1-1 at 17. That page was apparently signed by an "Authorized Representative," but the signature is undated, and there is no indication of the authorized representative's name, employer, or location when signing. *Id.* Federal Insurance Company appears to be listed as the issuer of the policy, and the signature page indicated that Federal is incorporated under the laws of Indiana. *Id.* Regardless, on the issues that must be decided to resolve the currently pending issues in this case, there is no significant difference between the laws of Maryland and Indiana.[6]

Under both Maryland and Indiana law, a threshold question in a contract dispute is whether the terms of the contract are ambiguous. *Point's Reach Condo. Council of Unit Owners v. Point Homeowners Ass'n, Inc.*, 73 A.3d 1145, 1163 (Md. Ct. Spec. App. 2013) (holding that "[w]hen a writing is ambiguous, extrinsic evidence is admissible to determine the intentions of the parties to the document"); *Sy-Lene of Washington, Inc. v. Starwood Urban Retail II, LLC*, 376 Md. 157, 163 (2003); *U.S. ex rel. Thorlief Larsen & Son, Inc. v. U.S. Fidelity and Guar. Corp.*, No. Civ.2:01 CV 597, 2005 WL 2136047, at *5 (N.D. Ind. Sept. 2, 2005) (citing *Sprague v. State*, 203 Ind. 581 (1932)) ("The written instrument at issue must be ambiguous before extrinsic evidence will be admitted"). Contract language is ambiguous "if, to a reasonably prudent person, the language used is susceptible of more than one meaning and not when one of the parties disagrees as to the meaning of the subject language." *Bd. of Educ. of Charles Cnty. v. Plymouth Rubber Co.*, 569 A.2d 1288, 1296 (Md. Ct. Spec. App. 1990); *see Sierra Club v. Dominion Cove Point LNG, L.P.*,

---

[6] In their filings, the parties assume that Maryland law applies to the contracts. *See* ECF 36, 38, 41. The parties are requested to fully brief the choice of law issue, to the extent it is necessary to resolve future disputes in this case.

86 A.3d 82, 89 (Md. Ct. Spec. App. 2014) ("[T]he mere fact that the parties disagree as to the meaning does not necessarily render [a contract] ambiguous."); *Chi. Southshore & South Bend. R.R. v. Itel Rail Corp.*, 658 N.E.2d 624, 633 (Ind. Ct. App. 1995) ("A contract is ambiguous if reasonable people would find the contract subject to more than one interpretation.").

Here, Jowite argues that the terms of the insurance policy are ambiguous, because some exclusions in the policy include "anti-concurrent cause" provisions, while others do not. Specifically, Jowite claims that "[t]he fact that anti-concurrent cause language is present in some exclusions and absent in others must have significance. At the very least, it creates an ambiguity in the interpretation of the Policy." ECF 36 at 6. While the inclusion of the anti-concurrent cause language in only some exclusions is likely significant to determining Jowite's coverage under the policy, there is no ambiguity presented. Any "reasonably prudent person" would conclude the anti-concurrent cause language applies in the exclusions in which it appears in the policy, and does not apply where it is absent. Further, none of the policy exclusions Defendant has claimed to bar coverage in this case contain the anti-concurrent clause provision. Therefore, Jowite's request that Defendant produce drafting notes for the anti-concurrent clause provision would not help in resolving the issues presented here. Considering Jowite has not cited any ambiguity in the other exclusions at issue, Jowite's request for the drafting notes of those exclusions are similarly not relevant. Accordingly, Jowite's requests for production of documents relating to the drafting of the policy will be denied.

### b. Defendant's Engineer Reports

The parties also dispute the withholding of certain engineering records by Defendant, on the claimed basis of work product protection. In addition to the legal standards of the work product doctrine already discussed, "[m]aterials prepared in the ordinary course of business or pursuant to regulatory requirements or for other non-litigation purposes do not constitute documents prepared in anticipation of litigation protected by [the] work product" doctrine. *Solis v. Food Emp'rs Labor Relations Ass'n*, 644 F.3d 221, 232 (quoting *Nat'l Union Fire Ins. Co. v. Murray Sheet Metal Co.*, 967 F.2d 980, 984 (4th Cir. 1992)) (internal quotations omitted). Rather, the party asserting the work product protection must prove that the documents at issue were "prepared *because* of the prospect of litigation." *Nat'l Union Fire Ins. Co.*, 967 F.2d at 984 (emphasis in original). In the context of insurance claims, "while litigation often results from an insurance company's denial of a claim, it cannot be said that any document prepared by an insurance company after such a claim has arisen is prepared in anticipation of litigation." *APL Corp. v. Aetna Cas. & Sur. Co.*, 91 F.R.D. 10, 17 (D. Md. 1980). Instead, the crucial question is at what point the "insurance company shifts its activity from the ordinary course of business to anticipation of litigation." *State Farm Fire & Cas. Co. v. Perrigan*, 102 F.R.D. 235, 238 (W.D. Va. 1984). "[N]o hard and fast rule governs when [the shift] occurs," *id.*, rather courts must determine "the driving force behind the preparation of each requested document" withheld on the claimed basis of work product protection, *Nat'l Union Fire Ins. Co.*, 967 F.2d at 984.

While not necessarily determinative, the date of the denial of coverage can serve as the point when the insurance company can be said to shift from its normal course of business to anticipation of litigation. *See Pete Rinaldi's Fast Foods, Inc. v. Great Am. Ins. Cos.*, 123 F.R.D. 198, 202 (M.D.N.C. 1988) ("Normally, only after the insurance company makes a decision with

respect to the claim, will it be possible for there to arise a reasonable threat of litigation so that information gathered thereafter might be said to be acquired in anticipation of litigation") (citing *APL Corp.*, 91 F.R.D. 10); *Westfield Ins. Co. v. Carpenter Reclamation, Inc.*, 301 F.R.D. 235, 250 (S.D. W. Va. 2014) ("Generally, it is reasonable to assume that . . . reports prepared by an insurance claims adjuster prior to the insurer's decision to deny coverage are conducted and prepared in the ordinary course of the insurer's business and must be disclosed in first-party coverage litigation."); *Millennium Inorganic Chems. Ltd. v. Nat'l Union Fire Ins. Co.*, Civil Action No. ELH-09-1893, 2011 WL 1466428, at *6 (D. Md. Apr. 15, 2011) (identifying the denial of coverage letter as a factor in finding that communications after were protected work product*); Ring v. Commercial Union Ins. Co.*, 159 F.R.D. 653, 656 (M.D.N.C. 1995) ("[T]he general rule is that a reasonable possibility of litigation only arises after an insurance company has made a decision with respect to the claim of its insured."); *but see Chambers v. Allstate Ins. Co.*, 206 F.R.D. 579, 588 (S.D. W. Va. 2002) (stating that in the context of fire losses possibly caused by arson that "[m]ost Courts considering when Defendants reasonably anticipated litigation in cases of this nature have not focused upon whether or when the insurer formally denied coverage. Rather, insurers are perceived as acting [in anticipation of litigation] when it becomes evident to them initially that the losses were caused by arson and the insured was involved in it.").

Jowite originally disputed Defendant's withholding of ten items indicated on Defendant's privilege log dating from September 7, 2017 to November 22, 2017. ECF 36-6. One of those disputed items was described as relating to Defendant's "internal proprietary strategy," which the Court believes is no longer at issue, *see* ECF 41 at 9 n.4. The remaining nine items all relate to Mr. Palumbo's engineer reports. *See* ECF 36-6 at 6-8.

Defendant argues that it began to act "in anticipation of litigation" on August 10, 2017, as a result of Goodman's email to Little, because Goodman was "aggressive," attached caselaw to support Jowite's claim, and indicated that counsel was involved. ECF 38 at 7. Goodman's email, however, is not at all aggressive in tone, and stated that it attached the cases at Little's request, following a phone call earlier that morning. ECF 38-11 at 4. Jowite's other actions that Defendant points to, such as hiring Goodman on a contingency basis, or contacting an engineering firm to "structure a reason for the collapse . . . [and] substantiate the claim," ECF 38-5 at 3-4, do not evince an intent to litigate the claim. Jowite's email to the engineering firm was dated July 25, 2017, just days after the original claim had been filed with Defendant. *Id.* Further, Jowite submitted an affidavit from Goodman stating that his firm has adjusted approximately 600 claims with Chubb, including eight other claims directly with Little, at least seven of which were resolved without litigation. ECF 41-5. Goodman explained that his reference to the cases he sent Little being "from counsel" were provided to Goodman by counsel in other cases his firm had handled. *Id.* Accordingly, Defendant cannot withhold the identified communications occurring between September 7, 2017, and November 22, 2017, on the basis of work product protection, because Defendant had not yet shifted from its ordinary course of business of investigating the claim to acting in anticipation of litigation.

In summary: (1) Defendant's should modify the Rauch subpoena to read, "Any and all communications between Rauch, Inc. and Jowite Limited Partnership, the Parkway Apartments, Alvin Lapidus, their attorneys or insurance carriers pertaining to the Jowite Apartment buildings;" (2) Defendant shall delay deposing Rauch until after Jowite's Rule 26(a)(2) disclosures; (3)

Defendant should modify the CSH subpoena to cover the timeframe prior to December 28, 2017, and to not cover Jowite's tax returns; (4) Jowite's request for the insurance policy drafting notes from Defendant is denied; and (5) Defendant should produce the communications relating to its engineer reports occurring between September 7, 2017, and November 22, 2017, that it had withheld under a claim of work product protection. Defendant should produce those communications relating to its engineer reports **BY MAY 8, 2019**. Accordingly Plaintiff's motion, ECF 32, and its letter of March 12, 2019, ECF 36, are GRANTED in part and DENIED in part.

Despite the informal nature of this letter, it is an Order of the Court and will be docketed accordingly.

Sincerely yours,

/s/

Stephanie A. Gallagher
United States Magistrate Judge