**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

JOWITE LIMITED PARTNERSHIP,      *

    Plaintiff,      *

v.      *

                         **Case No.: DLB-18-2413**

FEDERAL INSURANCE COMPANY,      *

    Defendant.      *

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*

## MEMORANDUM OPINION

In this breach of contract case, plaintiff Jowite Limited Partnership ("Jowite") and defendant Federal Insurance Company ("Federal") dispute whether, under an all-risk insurance policy, there is coverage for damages to an apartment building that resulted from the defective design and construction of the building's foundation and the subsequent settlement of the building. At the core of this dispute is whether the ensuing loss clause in the Policy's defective design and construction exclusion restores coverage. The parties filed cross-motions for summary judgment. ECF Nos. 85, 88.[1] For the reasons stated below, the Court will deny Jowite's motion and grant Federal's motion. There is no coverage under the Policy for the damage to the building. Judgment as a matter of law will be entered in favor of Federal.

---

[1] The parties fully briefed the motion, including through supplemental briefing after Judge Hollander issued a Memorandum Opinion in another case addressing the issue presented in this case. ECF Nos. 85-3, 88-1, 90, 92, 93. A hearing is not necessary. *See* Loc. R. 105.6.

**Factual Background**[2]

The material facts of this case are not in dispute.  Jowite owns the Jowite Apartments located at 406 Moton Street, Easton, Maryland 21601.  Pl.'s Opp'n & Mem. 1, ECF No. 88-1; Def.'s Mem. 2, ECF No. 85-3.  The Jowite Apartments were built in the late 1980s.  Pl.'s Opp'n & Mem. 1; Def.'s Mem. 2.  There are three apartment buildings on the property:  Buildings 100, 200, and 300.  Pl.'s Opp'n & Mem. 1; Def.'s Mem. 2.  In about 1999, the property manager, Debra Moxey, observed that the right side of Building 300 "was sinking" into the ground.  Moxey Dep. 11:5–12:7, ECF No. 88-9.  Moxey said that the management company "fix[ed]" the problem by having "a house moving company . . . plug[] it back up."  *Id.* at 11:17–12:18.

Fourteen years later, in January 2013, a new management company, TM Associates, Inc. ("TM"), took over responsibility for the Jowite Apartments.  Mgmt. Agr., ECF No. 88-13.  TM hired Rodney Wilkinson for building improvement needs.  Immediately after he began working at the property, Wilkinson observed the sinking of Building 300.  Wilkinson Dep. 13:10–15, 19:3–11, ECF No. 85-14.

In 2015, TM retained an engineering firm to evaluate the settlement issues with Building 300.  On May 26, 2015, ABBA Engineering, LLC ("ABBA") inspected Building 300 and observed "uneven floors," "cracks in the brick facing," and "standing water" in the crawl space beneath the building.  June 9, 2015 ABBA Report, ECF No. 88-15, at 5–6.  The firm attributed the issues to "a concentrated load that may not have been accounted for in the original design and over time has sagged due to insufficient support in th[e] area."  *Id.*  The firm noted that "there may be some

---

[2] In ruling on cross-motions for summary judgment, this Court "resolve[s] all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion." *Wheelabrator Baltimore, L.P. v. Mayor & City Council of Baltimore*, No. GLR-19-1264, 2020 WL 1491409, at *4 (D. Md. Mar. 27, 2020) (quoting *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003)).

settlement going on." *Id.* The engineering firm recommended "locat[ing] this area in the crawl space, provid[ing] blocking between the floor joists and beam in the crawl space and if there is not an existing pier close by, provid[ing] a cmu pier under this area" to "arrest the problem." *Id.*

TM hired a contractor, Willie Guy of Capital Construction Services, LLC ("CCS"), to "repair . . . the support beam under building 300." Aug. 24, 2015 Ltr. from CCS, ECF No. 85-17. Guy observed that the second floor "was severely out of level." Guy Dep. 14:22–15:3, ECF No. 85-15. He "went down into the crawl space" and found that "the footer had failed"; it "was cracked and appeared to be sinking." *Id.* at 15:4–6, 22:4–17. Guy also noted "severe cracks, settlement cracks" on the walls inside the building. *Id.* at 36:15–37:11. He stated that it was "obvious to [him] and everyone else that was there that the building was sunk in th[e] corner." *Id.* at 25:5–7. Guy installed "20 ton hydraulic jacks" to "raise[] [a] beam back up to correct the hallway." *Id.* at 26:15–27:1, 29:17–18.

> Following that remedial work, on August 24, 2015, Guy informed TM:
>
> Upon the execution of the repair to the support beams under building 300 we observed several structural problems we feel need to be addressed. The foundation and the footer on the rear wall have failed causing the building to become extremely out of level. The cracking in the bricks are evidence of severe settling. In addition the loss of support on the outside walls have caused the transfer of weight to the inside floor support beams that were not intended to support this kind of load[;] that is the reason they have failed and have been replaced. We feel there is an excessive amount of water being held under the building causing the footers to have little or no support due to the footing resting on mud. It appears the footer is approximately 5" thick and there are several cracks. We observed w[h]ere work has been done to level the building in the past but feel that attempt did not cure the problem.

Aug. 24, 2015 Ltr. from CCS.

On September 21, 2015, ABBA inspected Building 300 again. Sept. 21, 2015 Ltr. from ABBA, ECF No. 88-15, at 3. In its report, ABBA noted that "the back exterior wall . . . ha[d] settled," the floors were "not level," and "[s]ometime in the past, this exterior wall had some work performed on it in an effort to level up that side of the building." *Id.* ABBA recommended

replacing the footers and regrading the area around Building 300. *Id.* The work was not done. Pl.'s Opp'n & Mem. 11.

Nearly two years later, on March 2, 2017, another company inspected Building 300. Demolition of the entire building was recommended because six of the twelve piers "ha[d] failed," and "[t]he building [was] dropping on the right rear side." Mar. 2, 2017 Invoice from Done Right, LLC, ECF No. 85-18. Jowite did not demolish the building.

On July 18, 2017, Jowite filed an insurance claim with Federal under an all-risk insurance policy that Federal had issued for the Jowite Apartments, including Building 300. Policy, ECF No. 1-1 (March 1, 2017–March 1, 2018 policy period); *see also* Am. Compl. ¶ 8, ECF No. 24; Def.'s Mem. 7–8. Jowite claimed that "[t]here [were] 8 units that [were] sinking into the ground due to ground settling" and sought coverage for the damage to the building. Claim Confirmation, ECF No. 85-19; Notice, ECF No. 88-24.

The Policy provides that Federal "will pay for direct physical loss or damage to:

- building; or
- personal property,

caused by or resulting from a peril not otherwise excluded, not to exceed the applicable Limit Of Insurance for Building Or Personal Property shown in the Declarations."

Policy, ECF No. 1-1, at 211.[3]

The Policy has a number of exclusions that "apply to all coverages." *Id.* at 222. The two exclusions at issue here are:

**Planning, Design, Materials Or Maintenance**
This insurance does not apply to loss or damage (including the cost of correcting or making good) caused by or resulting from any faulty, inadequate or defective:

---

[3] Defined terms appear in bold in the Policy. The emphasis is removed where the Policy is quoted in this Memorandum Opinion.

- Planning, zoning, development, surveying, siting;
- Design, specifications, plans, workmanship, repair, construction, renovation, remodeling, grading, compaction;
- Materials used in repair, construction, renovation or remodeling; or
- Maintenance

of part or all of any property on or off the premises shown in the Declarations [("defective design and construction exclusion")].

This [defective design and construction] exclusion does not apply to ensuing loss or damages caused by or resulting from a peril not otherwise excluded.

. . .

***Settling***

This insurance does not apply to loss or damage caused by or resulting from settling, cracking, shrinking, bulging or expansion of land, paved or concrete surfaces, foundations, pools, buildings or other structures.

This Settling exclusion does not apply to ensuing loss or damage caused by or resulting from a specified peril.

*Id.* at 225, 229.  The Policy does not define "peril," the term used in the defective design and construction exclusion.  But it does define "specified peril," the term used in the settling exclusion, as "aircraft or self-propelled missiles; explosion; fire; leakage from fire protection equipment; lightning; mine subsidence; riot or civil commotion; sinkhole collapse; smoke; vandalism; vehicles; volcanic action; or windstorm or hail." *Id.* at 331.  The Policy also provides that the insured may not bring a legal action against the insurer unless "[t]he action is brought within three years after the date on which the direct physical loss or damage occurred." *Id.* at 306.

Upon receipt of Jowite's insurance claim, Federal retained Nicholas Palumbo, an expert in structural engineering, to inspect Building 300.  Palumbo Dep. 10:15–21, ECF No. 85-21; Nov. 3, 2017 Palumbo Report 1, ECF Nos. 85-20, 88-31.  Palumbo observed:

[The structure . . . ha[s] significant cracks around the exterior brick façade, as well as the interior walls.  The most severe cracking was observed near the northwest corner, where the building was measured to have settled 10 inches lower than the opposing corner. . . .

. . .

5

> It was apparent that past attempts were made to address slow and continuing consequences that may have occurred as a result of ongoing settlement over the building's approximately 30-year life. These repairs include caulking and repointing the brick, patching interior wall cracks, repairing and installing new CMU blocks in the foundation walls, installing supplemental structural framing below the first floor, and installing steel and wood shims to help raise the floor at the most significantly settled areas. A majority of these repairs were superficial, and did not address the root cause of the matter.

Nov. 3, 2017 Palumbo Report 9–10. He "identified two primary issues resulting in the observed settlement. First, and perhaps the most significant, is the organic soil fill below the structure. . . . Organic matter is not appropriate for structural fill below foundations, as it is naturally degradable and compressible." *Id.* at 9. Second, "the footings were irregularly shaped with off-centered piers." *Id.* He stated that he did "not recommend inhabitance of the structure at this time." *Id.* at 10. According to Palumbo, "[c]ontinued settlement will further the observed concerns within the superstructure," including "out-of-level floors, continued wall and brick cracking, racking and unusable windows, water leaks through openings in the exterior wall, and additional issues." *Id.*

Jowite retained Ravindra Malviya, P.E. as a liability expert. Malviya opined that "the root cause of the problem that Building 300 has experienced is inadequate design and construction of building foundations." Malviya Dep. 28:4–6, ECF No. 88-16. He admitted that "settlement [was] causing the cracking" and unlevel floors, but he insisted that "settlement [was] not the cause of the problem, because if the foundations were adequately designed and supported, you will not see any settlement." *Id.* at 120:2–121:21.

Federal denied the claim because it maintained that at least two exclusions bar coverage, the defective design and construction exclusion and the settling exclusion. Dec. 28, 2017 Denial Ltr. 3–5, ECF No. 88-25. On August 8, 2018, Jowite, filed this lawsuit for breach of contract and declaratory judgment. Compl., ECF No. 1.

**Standard of Review**

Summary judgment is appropriate when the moving party establishes that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To meet its burden, the party must identify "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials" in support of its position. Fed. R. Civ. P. 56(c)(1)(A). Then, "[t]o avoid summary judgment, the opposing party must set forth specific facts showing that there is a genuine issue for trial." *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 205 (4th Cir. 2019) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The opposing party must identify more than a "scintilla of evidence" in support of its position to defeat the motion for summary judgment. *Anderson*, 477 U.S. at 251. Although "a court should not weigh the evidence," *Perkins*, 936 F.3d at 205 (quoting *Anderson*, 477 U.S. at 249), if "a party fails to establish the existence of an element essential to that party's case" or "'the record taken as a whole could not lead a rational trier of fact to find for the non-moving party,'" then summary judgment is proper, *id.* (quoting *Teamsters Joint Council No. 83 v. Centra, Inc.*, 947 F.2d 115, 119 (4th Cir. 1991)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). In ruling on cross-motions for summary judgment, this Court must "review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Wheelabrator Baltimore, L.P. v. Mayor & City Council of Baltimore*, No. GLR-19-1264, 2020 WL 1491409, at *4 (D. Md. Mar. 27, 2020) (quoting *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003)).

## Maryland Principles of Contract Construction

Maryland law governs the Policy.  Pl.'s Opp'n & Mem. 4 & n.6; Def.'s Mem. 13.  "In Maryland, 'the interpretation of an insurance policy is governed by the same principles generally applicable to the construction of other contracts . . . .'"  *Mitchell v. AARP Life Ins. Program, New York Life Ins. Co.*, 779 A.2d 1061, 1069 (Md. Ct. Spec. App. 2001).  The interpretation of an insurance policy, like the interpretation of any other contract, "is ordinarily a question of law for the court."  *Jos. A. Bank Clothiers, Inc. v. J.A.B.-Columbia, Inc.*, No. ELH-15-3075, 2017 WL 6406805, at *7 (D. Md. Dec. 15, 2017); *see Clendenin Bros. Inc. v. U.S. Fire Ins. Co.*, 889 A.2d 387, 393 (Md. 2006).  Thus, "the court bears responsibility for ascertaining the scope and limitations of an insurance policy."  *Bethany Boardwalk Grp. LLC v. Everest Sec. Ins. Co.*, No. ELH-18-3918, --- F. Supp. 3d ----, 2020 WL 1063060, at *7 (D. Md. Mar. 5, 2020) (citing *Fister v. Allstate Life Ins. Co.*, 783 A.2d 194, 199 (Md. 2001)).

When determining "the issue of coverage under an insurance policy, the primary principle of construction is to apply the terms of the insurance contract itself."  *Id.* (quoting *Universal Underwriters Ins. Co. v. Lowe*, 761 A.2d 997, 1005 (Md. Ct. Spec. App. 2000)). The court considers the insurance policy's plain language and generally assigns "the words and phrases . . . their ordinary and accepted meanings as defined by what a reasonably prudent lay person would understand them to mean."  *Id.* (quoting *Universal Underwriters*, 761 A.2d at 1005).  If it is evident that the parties intended specific terms to have "a special or technical meaning," such as if the "'policy defines a term in a manner which differs from the ordinary understanding of that term,'" then "those words are construed in accordance with that understanding."  *Id.* at *8 (quoting *Valliere v. Allstate Ins. Co.*, 596 A.2d 636, 638 (Md. 1991)).  And, if a policy term is ambiguous, that is, "'if, to a reasonably prudent person, the term is susceptible to more than one meaning,'" then "the

court may consult 'extrinsic sources" to ascertain the meaning." *Id.* (quoting *Cole v. State Farm Mut. Ins. Co.*, 753 A.2d 533, 537 (Md. 2000)).

On a claim for breach of an insurance policy, "the insured bears the burden of proving every fact essential to his or her right to recovery, ordinarily by a preponderance of the evidence." *Gen. Ins. Co. v. Walter E. Campbell Co.*, 241 F. Supp. 3d 578, 597 (D. Md. 2017) (citing *N. Am. Acc. Ins. Co. v. Plummer*, 167 Md. 670, 176 A. 466, 469 (1935)), *aff'd sub nom. Gen. Ins. Co. v. United States Fire Ins. Co.*, 886 F.3d 346 (4th Cir. 2018), *as amended* (Mar. 28, 2018). If the insured meets its burden and the "insurer [has] relie[d] upon a policy exclusion to deny coverage, the insurer bears the burden of proving that the exclusion applies." *Ellicott City Cable, LLC v. Axis Ins. Co.*, 196 F. Supp. 3d 577, 584 (D. Md. 2016) (citing *Finci v. Am. Cas. Co.*, 593 A.2d 1069, 1087 (Md. 1991)). Maryland, "[u]nlike the majority of other states, . . . does not follow the rule that insurance policies are to be most strongly construed against the insurer." *Empire Fire & Marine Ins. Co. v. Liberty Mut. Ins. Co.*, 699 A.2d 482, 494 (Md. Ct. Spec. App. 1997) (emphasis in original)). Even so, under Maryland contract law, "if an insurance policy is ambiguous, it will be construed liberally in favor of the insured and against the insurer *as drafter of the instrument.*" *Id.* (emphasis in original). Additionally, "[b]ecause 'exclusions are designed to limit or avoid liability, they will be construed more strictly than coverage clauses and must be construed in favor of a finding of coverage.'" *Bethany*, 2020 WL 1063060, at *8 (quoting *Megonnell v. United Servs. Auto. Ass'n*, 796 A.2d 758, 772 (Md. 2002)).

## Discussion

The parties agree that the foundation of Building 300 was defectively designed and constructed and that the damage to the superstructure of the building was caused by the faulty and

defective design and construction of the building's foundation.[4]  Def.'s Resp. to Pl.'s Requests for Admissions No. 3–11, 16–24, ECF No. 88-7; Pl.'s Opp'n & Mem. 2–3.  The parties also agree that the defective design and construction exclusion applies.  Def.'s Mem. 12; Pl.'s Opp'n & Mem. 22.

Where they disagree is whether the ensuing loss exception to the exclusion restores coverage.  The ensuing loss clause states that the defective design and construction exclusion "does not apply to ensuing loss or damages caused by or resulting from a peril not otherwise excluded."  Policy, ECF No. 1-1, at 225.  Jowite argues that the building collapsed (a term not defined in the contract), that its collapse caused serious damage to the superstructure of the building, and that collapse is a "peril not otherwise excluded."  Pl.'s Opp'n & Mem. 2–3.  Federal disagrees.  According to Federal, if the building collapsed (which Federal argues it did not), collapse is the damage, not a separate and distinct peril.  Def.'s Mem. 28.  In Federal's view, none of the damage to the superstructure of the building was "caused by or resulting from a peril not otherwise excluded."  *Id.* at 26.  Federal argues that any collapse of the building and damage to the superstructure was caused by or resulted from the defective design and construction of the foundation.  *Id.* at 11–12.  Federal also argues that if Building 300 collapsed and if the collapse resulted in loss, "it is conceptually impossible to disentangle [that loss from] the damage caused by 'defective design and construction' . . . and 'settlement'—[both] of which are excluded," and "[t]herefore, there is no coverage."  Def.'s Supp. 4.

---

[4] The defective design and construction involved the use of organic matter as a structural fill below the foundation and the use of irregularly shaped footings with off-centered piers.  Nov. 3, 2017 Palumbo Report 9; Malviya Dep. 34:20–35:10, 39:11–40:2, 41:1–4, 65:1–17, 77:2–9.  This defective design and construction caused the settlement, which caused the damage to the superstructure, including "out-of-level floors," "wall and brick cracking, racking and unusable windows, water leaks through openings in the exterior wall, and additional issues."  Nov. 3, 2017 Palumbo Report 10.  The building's superstructure is anything above the foundation, including the floors, internal and external walls, and windows.  Superstructure, Oxford English Dictionary, www.oed.com.

**Ensuing Loss Exception in the Defective Design and Construction Exclusion**

Ensuing loss clauses "operate to 'preserve coverage when a loss excluded under a policy—[such as] a loss caused by a defect in workmanship—results in a subsequent or 'ensuing' loss that otherwise would be covered.'" *Bethany Boardwalk Grp. LLC v. Everest Security Ins. Co.*, No. ELH-18-3918, --- F. Supp. 3d ----, 2020 WL 1063060 at *9 (Mar. 5, 2020) (quoting *Taja Invs. v. Peerless Ins. Co.*, 717 F. App'x 190, 192 (4th Cir. 2017)).  An ensuing loss clause "benefits both the insurer and the insured: it preserves the policy's exclusions while at the same time guarantees coverage for covered losses notwithstanding the occurrence of an excluded peril." *Id.*  These "clauses are 'well recognized in Maryland case law'" but infrequently discussed by the state appellate courts. *Id.* at *10 (quoting *Selective Way Ins. Co. v. Nat'l Fire Ins. Co.*, 988 F. Supp. 2d 530, 538 (D. Md. 2013)); *e.g.*, *McEvoy v. Sec. Fire Ins. Co.*, 73 A. 157, 160 (Md. 1909) (considering ensuing loss clause and concluding that the insurance policy did not cover "direct loss caused by . . . independent destructive forces" but did cover "the loss caused by fire ensuing from them"); *Transatlantic Fire Ins. Co. v. Dorsey*, 56 Md. 70, 79–80 (1881) (considering ensuing loss clause where damages from original peril—fire—were covered and damages from secondary peril—explosion—were exempted from liability (the reverse of the circumstances currently before the Court) and concluding that "such loss should be regarded as within the risk assumed by the insurers" because "the fire [was] the direct and efficient cause of the loss and the explosion but the incident"); *see also James McHugh Constr. Co. v. Travelers Prop. Cas. Co.*, 223 F. Supp. 3d 462, 473 (D. Md. 2016) (concluding that ensuing loss clause did not apply because the damage at issue "was directly the result of faulty workmanship"); *Morgan- Keller, Inc. v. Lexington Ins. Co.*, GLR-12-2958, 2014 WL 12737621, at *4 (D. Md. June 16, 2014) ("'[A]n ensuing loss provision does not cover loss directly caused by the excluded peril (i.e., repair of the faulty work), but rather

covers loss caused to other property wholly separate from the defective property itself.' Here, the damage to the windows is not a covered ensuing loss because the damage is a direct result of the alleged faulty work. The sole damage caused by the [window] cleaning was to the property upon which [the window washer] was performing its work; there is no loss to wholly separate property." (quoting *Selective Way Ins.*, 2013 WL 6705138, at *8)).

The parties dispute the scope of the ensuing loss clause. Federal argues that the clause only restores coverage if there has been an independent, superseding event that caused the loss and, here, it argues, there has been none. Def.'s Mem. 12. Jowite insists on a broader reading of the ensuing loss clause. It argues that the ensuing loss exception restores coverage where any peril "not otherwise excluded" occurs, without "any requirement [that] an intervening destructive force" precede the peril. Pl.'s Opp'n & Mem. 32.

On this point, *Bethany Boardwalk Group LLC v. Everest Security Insurance Co.*, 2020 WL 1063060, provides guidance. In a breach of contract and declaratory judgment action, Bethany Boardwalk Group, LLC ("Bethany") sued its insurer, Everest Security Insurance Co. ("Everest"), after Everest denied its claim for "costs incurred to repair the hotel's room and for interior water damage, as well [as] lost business income" following a windstorm that "'peeled back'" the hotel's roof, resulting in damage to its hotel. *Bethany*, 2020 WL 1063060, at *1–2. As a result of the damage to the hotel's roof, "water infiltrated the [hotel] at two locations . . . , requiring the replacement of portions of the drywall and . . . carpeting" in one hotel room and "staining the drywall ceiling" in the hotel's restaurant. *Id.* at *2. The insurer had "denied the claim on the ground that the hotel's roof was defective, and therefore Bethany's losses were subject to the policy's exclusion for faulty workmanship." *Id.* at *1. Section B(3) of the insurance policy provided that "Everest 'will not pay for loss or damage caused by or resulting from' faulty

workmanship, '[b]ut if [faulty workmanship] results in a Covered Cause of Loss,' Everest 'will

pay for the loss or damage caused by that Covered Cause of Loss.'" *Id.* at *9 (quoting policy).

The parties agreed that "the Hotel's roof was defective" and that "the 'faulty workmanship'

provision in Section B(3)(c) of the Policy expressly excludes coverage for such defects," but they

"fiercely dispute[d] whether the storm, a 'Covered Cause of Loss,' trigger[ed] the ensuing loss

clause in Section B(3), thereby restoring coverage for the Hotel's losses." *Id.* Faced with this

dispute, the Court considered "whether an ensuing loss clause applies to a covered loss that is

causally related to an excluded peril, or applies only when the covered loss is the result of an

independent or superseding event." *Id.* at *10. The Court looked to its decision in *Selective Way*

*Insurance Co. v. National Fire Insurance Co.*, 988 F. Supp. 2d 530, for guidance.

> In that case, the plaintiff argued than the ensuing loss clause in its insurance policy covered water damage to a brand-new university building caused by a faultily installed water supply line that leaked water. Chief Judge Bredar ruled that the ensuing loss clause, which contained language identical to the provision at issue [in *Bethany*], applied. . . . [T]he court found that the defective installation "d[id] not, by the terms of the policy, exclude the water damage that resulted from faulty installation." Rather, the court explained: "Coverage for water damage—a covered cause of loss—resulting from faulty workmanship or installation—an excluded cause—is a logical interpretation of the ensuing loss provision of the Policy." Accordingly, Chief Judge Bredar found that the water damage was covered under the ensuing loss clause because it was "a step removed from the faulty workmanship and was not directly caused by it."

*Bethany*, 2020 WL 1063060, at *13 (quoting *Selective Way Ins.*, 988 F. Supp. 2d at 531, 532, 538,

541).

After extensive analysis of ensuing loss case law from around the country, the Court

determined that there is "good reason to believe that Maryland law favors a broad construction of

the ensuing loss clause." *Id.* It reasoned that reading "an implicit 'separate and independent'

limitation into the insurance police contravenes the 'primary principle' of Maryland contract law

'to apply the terms of the insurance contract itself.'" *Id.* (quoting *Bausch & Lomb Inc. v. Utica*

*Mut. Ins. Co.*, 625 A.2d 1021, 1031 (Md. 1993)).  The Court then analyzed the policy's ensuing

loss clause and found that it "applie[d] coverage to a covered event traceable to an excluded peril."

*Id.*  Ultimately, the Court found that, under the facts of the case before it, whether the clause was

"construed broadly or narrowly, the outcome would be the same."  *Id.* at *11 n.6, *15.

The *Bethany* Court concluded that the insured was "not entitled to damages for the cost to

repair or replace the roof" because the roof's defective construction caused it to be unable "to

withstand uplift wind pressure," which resulted in damage to the roof, and the policy did not cover

loss from faulty workmanship.  2020 WL 1063060, at *13.  The windstorm, however, was a

"discrete meteorological event, independent of the defective roof," and it was a covered cause of

loss.  Because the water damage inside the hotel and the lost business income resulted from the

windstorm, they were covered losses.  *Id.*

Significantly, the Court concluded that the damage that the storm caused to the roof, as

opposed to the interior of the building, was "not covered under the ensuing loss clause" because it

was "inextricably intertwined with the faulty workmanship."  *Id.*  It reasoned:

> To be sure, the roof would not have peeled back absent strong winds.  However, it
> is not disputed that, but for the defective installation, the roof should have withstood
> the wind.  Consequently, each dollar spent on the Hotel's roof necessarily serves
> two ends: repairing storm damage and curing the defect.  Therefore, Everest has no
> obligation under the Policy to cover the cost to repair or replace the defective
> roof. . . .
>
> [G]iven that the roof's defects made it susceptible to wind, it is conceptually
> impossible to disentangle the damage caused solely by faulty workmanship and that
> caused solely by the wind.  Indeed, Bethany's position is no different than trying to
> parse whether a weak foundation or gravity is to blame for a building's collapse.
> *See Performing Arts Cmty. Improvement Dist. v. Ace Am. Ins. Co.*, 13-0945-CV-
> W-ODS, 2015 WL 3491292, at *6 (W.D. Mo. June 3, 2015).

*Id.* at *15 (some citations omitted).  Thus, the causal relationship between the damages caused by

faulty workmanship (which was not covered) and the damages to the roof from the storm (a

covered event) was immaterial; what mattered was that the damages from the two causes could

not be dissected.  *Id.*  The Court concluded that the "ensuing loss clause only cover[ed] 'property wholly separate from the defective property itself'" and could not cover damages that the storm caused to the roof when the faulty workmanship also damaged the roof, because to construe the clause to provide such coverage "would transform the ensuing loss clause into a 'grant back' provision and eviscerate the faulty workmanship exception."  *Id.* at *16 (quoting *Montefiore Med. Ctr. v. Am. Protection Ins. Co.*, 226 F. Supp. 2d 470, 479 (S.D.N.Y. 2002)).

Here, the same reasoning applies.  Even if the Court interprets the ensuing loss clause broadly to allow for coverage of causally related loss and does not require an independent, intervening event, as Jowite argues, only loss "wholly separate from the defective property" is covered.  *See id.*  The ensuing loss clause at issue here restores coverage for "loss or damages caused by or resulting from a peril not otherwise excluded."  Jowite argues that the "peril not otherwise excluded" is the collapse of the building.  Pl.'s Opp'n & Mem. 32.  At the same time, Jowite also argues that the collapse is the "ensuing loss or damages" caused by the peril.  *Id.* at 32, 33, 41.  Jowite's argument conflates damages and peril, suggesting they are one and the same. Under the plain language of the ensuing loss clause, they are different.  The "damages" must be caused by or result from the "peril not otherwise excluded." This flaw in Jowite's analysis exposes why there is no coverage for the loss:  the damages to the superstructure of the building, even if caused by a collapse, cannot be separated from the damages resulting from the defective design and construction of the building.

The Court will assume, for purposes of the analysis, that a serious impairment of the building has occurred such that it is a "collapse" under Maryland law, and that the collapse is a "peril not otherwise excluded." *See 130 Slade Condo. Ass'n, Inc. v. Millers Capital Ins. Co.*, No. CCB-07-1779, 2008 WL 2331048, at *2 (D. Md. June 2, 2008) ("[I]n insurance policies where the

meaning of the term 'collapse' is ambiguous, Maryland has adopted the minority rule in finding that 'any serious impairment of structural integrity is a collapse within [ ] policy coverage.'" (quoting *Kay v. United Pacific Ins. Co.,* 902 F. Supp. 656, 659 (D. Md. 1995))). Even under these assumptions, there is no coverage for the resulting loss. It is undisputed that the foundation of Building 300 was improperly designed and constructed, which caused the building to settle. It is also undisputed that because of the defective design and construction of the foundation and the subsequent settlement, Building 300's superstructure had a serious impairment of structural integrity. Bricks and walls have cracked, floors are uneven, windows are racked and cannot be opened and closed properly, and water is leaking into the building. This serious impairment of structural integrity was not a distinct event that happened one day or had a specific commencement. Certainly, there was no meteorological event, such as a windstorm, earthquake, or below-freezing temperatures, that set into motion a chain of events resulting in the damage. The serious impairment of structural integrity was caused solely by the defective design and construction of the foundation and the resulting settlement. Indeed, Jowite agrees that "[t]he improper design and construction of the foundation *caused Building 300's superstructure to settle over the years*." Pl.'s Opp'n & Mem. 2–3 (emphasis added). Thus, the Court finds that any loss or damage caused by the collapse is not "wholly separate from the defective property itself." *Bethany*, 2020 WL 1063060, at \*16.

The damages to the superstructure of Building 300 are unlike the interior water damage discussed in *Bethany*. They also are unlike the water damage in *Selective Way*, which resulted from faulty workmanship on a water supply line but was "a step removed from the faulty workmanship and was not directly caused by it." 988 F. Supp. 2d at 531, 532, 538, 541. They are, instead, comparable to the damage that the storm caused to the roof in *Bethany*, because they

are "inextricably intertwined with the faulty workmanship." *See Bethany*, 2020 WL 1063060, at *13. The serious impairment of structural integrity of the superstructure was the result of a natural and expected progression of deterioration caused by the building's settlement. The settlement was caused by the defective design and construction of the foundation. Thus, the current damages to the building's superstructure are inextricably connected to, and intertwined with, the faulty workmanship in the construction and design of the building's foundation over 30 years ago.

Jowite attempts to separate Building 300's defectively designed and constructed foundation from the damages to its superstructure. These attempts are unpersuasive. The defective design and construction of the foundation is inseparably related to the damages to the superstructure, differentiated only by the passage of time. It is undisputed that, but for the defective design and construction of the foundation, the building would not have suffered serious structural impairment. There is no other cause for the impairment. Simply put, damages to the superstructure are damages directly resulting from the poorly constructed and designed foundation. Any effort to remedy one necessarily would require remedying the other. The defectively designed and constructed foundation and the subsequent damages to the superstructure are inseparable. The superstructure is not "cover[ed] 'property wholly separate from the defective property itself.'" *See Bethany*, 2020 WL 1063060, at *16.

The Court finds that the parties intended for the Policy to exclude damages caused by or resulting from the defective design and construction of Building 300's foundation. These damages include damages to the superstructure, such as cracking walls and bricks and racked windows. These structural impairments flowed directly, naturally, and predictably from the defectively designed and constructed foundation. Any other conclusion "would transform the ensuing loss

clause into a 'grant back' provision and eviscerate the [defective design and construction] exception." *Id.* The exclusion bars coverage.

## Settling

Even if the defective design and construction exclusion did not bar coverage, the Policy's settling exclusion would. Before discussing the settling exclusion, however, the Court must address one of Jowite's principal arguments. Jowite argues that the "efficient proximate cause" rule should limit the coverage analysis to the defective design and construction exclusion. According to Jowite, the defective design and construction of the foundation was the initial event that set into motion a chain of events, including the eventual settlement of the building and ultimately the collapse of the building. Jowite argues that, under the "efficient proximate cause" rule, the Court may not consider the applicability of any policy exclusion that may apply to events, such as settling, that occurred after the foundation was poorly constructed. *See* Pl.'s Opp'n & Mem. 23–24. The Court disagrees.

Courts in other jurisdictions have applied "the doctrine of efficient proximate cause," which is "[b]orrowed from principles of causation in tort law," to find that an insurance policy "provides for coverage where an insured peril sets in motion a chain of events that includes excluded events." *Bethany*, 2020 WL 1063060, at *16 (citing *Couch on Insurance* § 101:45 (collecting cases)). The Maryland Court of Appeals has not considered the doctrine's applicability to first-party property claims, however, and this Court has not extended the doctrine in this context. *See id.* (declining to "rely on [this] doctrine grounded in tort law to thwart the plain language of the Policy"); *Bao v. Liberty Mut. Fire Ins. Co.*, 535 F. Supp. 2d 532, 540 (D. Md. 2008) (concluding that "the Maryland Court of Appeals would not apply the efficient proximate cause rule, but would instead follow the plain language of [a] clause in the policy's exclusion"). Indeed,

18

the Maryland Court of Appeals has provided a "clear directive to apply the terms of the insurance contract" and "refus[ed] to import tort law principles to the interpretation of insurance contracts." *Bethany*, 2020 WL 1063060, at *16 (citing *Bausch & Lomb*, 625 A.2d at 1031); *see also Selective Way Ins.*, 988 F. Supp. 2d at 539 (interpreting insurance policy "according to its terms" to determine coverage instead of "referring to principles of causation in tort law," because "Maryland cases have been clear that interpretation of an insurance contract is not dependent upon principles of tort law").

Jowite relies on the discussion of proximate cause in *Hartford Steam Boiler Inspection & Insurance Co. v. Henry Sonneborn & Co.*, where the court determined coverage based on "the direct and efficient cause of the damage and loss to the property." 54 A. 610, 611–12 (Md. 1903). *Hartford Steam* is inapposite because the contract at issue in that case limited coverage to "immediate loss or damage," and the court focused its analysis on the meaning of "immediate." *Id.* That language is not present in the Policy before the Court.

In any event, the loss at issue here did not result from a *covered* peril that "set[] into motion a chain of events occurring in an unbroken sequence culminating in damage from an excluded peril." *See Bao*, 535 F. Supp. 2d at 537 n.4. Rather, it is undisputed that the loss resulted from defective design and construction, an *excluded* peril, which set into motion events that resulted in damages from settling, yet another excluded peril. Pl.'s Opp'n & Mem. 25–26; Def.'s Supp. 4. These are not the circumstances in which efficient proximate cause is considered. *See Bethany*, 2020 WL 1063060, at *16; *Bao*, 535 F. Supp. 2d at 537 n.4. The Court will not apply the doctrine of efficient proximate cause to limit the number of exclusions that may bar coverage under the Policy when damages resulted from a sequence of excluded perils. The Policy will be interpreted according to its terms, which do not state that only one exclusion may apply.

The Policy's settling exclusion bars coverage for "loss or damage caused by or resulting from settling, cracking, shrinking, bulging or expansion of land, paved or concrete surfaces, foundations, pools, buildings or other structures." Policy, ECF No. 1-1, at 226. The exclusion also has an ensuing loss clause: "ensuing loss or damage caused by or resulting from a specified peril" is excepted from this exclusion. *Id.*

Here, the damages to the superstructure of the building were caused by or resulted from settling. Federal's expert Nicholas Palumbo testified that "the settlement caused the issues with the superstructure." Palumbo Dep. 77:12–18. Palumbo reported that "[c]ontinued settlement will further the observed concerns within the superstructure," including "out-of-level floors, continued wall and brick cracking, racking and unusable windows, water leaks through openings in the exterior wall, and additional issues." Nov. 3, 2017 Palumbo Report 10. Jowite admits that "[t]he settlement. . . resulted from the defective design and construction of the foundation, and caused the structural impairment of the superstructure." Pl.'s Opp'n & Mem. 26; *see id.* at 2–3 ("The improper design and construction of the foundation caused Building 300's superstructure to settle over the years . . . resulting in substantial damages to the superstructure."). Settlement may not be the only cause or the root cause of the damages to the superstructure, but it is certainly a cause. In any event, there can be no dispute that the damages to the superstructure "resulted from" the settlement. Thus, the Court finds that the settling exclusion applies because the damages to the superstructure of the building were "caused by or result[ed] from settling." *See* Policy, ECF No. 1-1, at 229; Pl.'s Opp'n & Mem. 25–26; Def.'s Supp. 4.

The ensuing loss exception to the settling exclusion does not restore coverage. It applies only if the damage resulted from a "specified peril," a term defined in the Policy as "aircraft or self-propelled missiles; explosion; fire; leakage from fire protection equipment; lightning; mine

subsidence; riot or civil commotion; sinkhole collapse; smoke; vandalism; vehicles; volcanic action; or windstorm or hail." Policy, ECF No. 1-1, at 331. None of those events occurred here. Accordingly, the settling exclusion bars coverage. *See id.* at 226.

Federal is entitled to judgment as a matter of law on all claims.[5]

## Conclusion

Federal's Motion for Summary Judgment, ECF No. 85, IS GRANTED, and Jowite's Motion for Summary Judgment, ECF No. 88, IS DENIED.

A separate order will issue.

Date: <u>August 14, 2020</u>                    <u>          /S/          </u>
                                                        Deborah L. Boardman
                                                        United States Magistrate Judge

---

[5] Because the defective design and construction and settling exclusions bar coverage, the Court does not reach Federal's arguments that the deterioration and inherent vice and latent defect exclusions bar coverage or that Jowite's claims are time-barred.